FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

00 SEP 29 PM 2: 43

U.S. DISTRICT COURT
N.D. OF ALABAMA

FLAVIOUS DUTTON,                     }
                                     }
        Plaintiff,                   }
                                     }
v.                                   }          CASE NO. CV 99-B-1105-NE
                                     }
DANIEL S. GOLDIN, Administrator,     }
NASA,                                }          **ENTERED**
                                     }
        Defendant.                   }          OCT - 2 2000

## MEMORANDUM OPINION

Currently before the court is Defendant's Motion for Summary Judgment, filed by Daniel

S. Goldin ("defendant" or "Goldin"), Administrator of National Aeronautics and Space

Administration ("NASA").[1] In his Complaint, plaintiff Flavious Dutton ("plaintiff" or "Dutton")

asserts claims of age-based discrimination pursuant to the Age Discrimination in Employment

Act ("ADEA"), 29 U.S.C. § 633a(c),[2] and national origin-based discrimination, race-based

discrimination, and retaliation  pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e-16(c).  Upon consideration of the record, the submissions of the parties, the arguments

of counsel, and the relevant law, the court is of the opinion that defendant's Motion is due to be

granted.

---

[1]  Plaintiff originally named both Goldin and NASA as defendants.  (Complaint ("Compl.") at
¶¶ 5, 6.)  By Order of Dismissal entered July 28, 1999, the court granted defendants' Motion to
Dismiss NASA as a Defendant, leaving Administrator Goldin, in his official capacity, as the sole
defendant.

[2]  In Count I of the Complaint, plaintiff asserts a claim of age discrimination.  (Compl. at ¶¶ 21-
23.)  Plaintiff has now abandoned this claim.  (Memorandum in Opposition to Motion for
Summary Judgment ("Pl.'s Br.") at 3, n.1.)

## I.   FACTUAL SUMMARY

Plaintiff applied for and was hired as an electronics technician at Marshall Space Flight Center ("MSFC") in September of 1981.  (DX,[3/] Deposition of Flavious Dutton ("Dutton Dep.") at 12.)  This lawsuit arises out of claims that plaintiff, a white grade eleven ("GS-11") electronics technician at the MSFC, was treated in a discriminatory manner as compared to a Hispanic electronics technician and a black electronics technician.  (Compl. at ¶¶ 24-25.) Plaintiff alleges national origin discrimination because he was not upgraded to a grade twelve ("GS-12") after a desk audit, as was a Hispanic electronics technician, Norman Pabon-Medina ("Pabon-Medina").  (Compl. at ¶¶ 27-28.)  Plaintiff alleges race discrimination because he was not converted to an engineering position as was an African-American electronics technician, James Crawford ("Crawford").  Defendant seeks summary judgment on both claims on both procedural and substantive grounds.

Plaintiff also asserts a claim labeled "retaliation," alleging that NASA's delay in issuing a Final Agency Decision in this case was the result of wrongful reprisal for his filing discrimination charges.  (Compl. at ¶ 30-31.)  Defendant asserts that the court lacks subject matter jurisdiction over this claim.

### A.   National Origin Discrimination Claim

During the time period at issue, Pabon-Medina, a Hispanic male, was a GS-11 electronics technician at MSFC.  (Compl. at ¶¶ 12-14; DX, Declaration of Bobby J. Johnson ("Johnson

---

[3/] Defendant filed a Submission of Evidence in Support of Defendant's Motion for Summary Judgment on January 31, 2000.  The evidence contained in this submission will be referred to as "DX," followed by a description of the evidentiary material.  Plaintiff filed Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment on February 22, 2000.  The evidence contained in this submission will be referred to as "PX," followed by the corresponding tab letter.

Decl.") at ¶ 4.) His first-level supervisor, Bobby Johnson ("Johnson"), sought to promote Pabon-Medina to a GS-12 electronics technician. (DX, Johnson Decl. at ¶¶ 3-6.) Johnson completed the requisite portion of the necessary form, a Standard Form 52 ("SF-52") Request for Personnel Action, which was then approved by his supervisory chain. (*Id.* at ¶¶ 5-6, Atts. A and B.) This request prompted the MSFC personnel office to conduct a desk audit[4/] of Pabon-Medina's position in order to determine whether the promotion was warranted. (*Id.* at ¶ 7; DX, Deposition of James H. Bramblett ("Bramblett Dep.") at 9-10, 24-26; Declaration of James H. Bramblett ("Bramblett Decl.") at ¶ 5.)

Personnel specialist Thomas Holden ("Holden") conducted a desk audit of Pabon-Medina's position, assisted by personnel specialist James Bramblett ("Bramblett").[5/] (DX, Bramblett Decl. at ¶ 6.) Johnson provided Holden and Bramblett with a proposed position description which he stated reflected Pabon-Medina's actual duties. (DX, Johnson Decl. at ¶ 4; DX, Bramblett Decl. at ¶ 7, Att. F.) During the desk audit, Bramblett and Holden consulted Johnson, interviewed Pabon-Medina, observed Pabon-Medina at his work site, and reviewed samples of Pabon-Medina's work. (DX, Bramblett Decl. at ¶¶ 7-8.) After comparing Pabon-Medina's actual duties against the classification standards for an Electronics Technician, Bramblett and Holden agreed that Pabon-Medina's position warranted an upgrade to the GS-12 level. (*Id.* at ¶ 8.) Thus, effective May 12, 1996, Pabon-Medina's position was upgraded to a GS-12 electronics technician's position. (DX, Responses to Defendant's Request for

---

[4/]  A desk audit is a review of a position by a personnel specialist to determine whether a job description needs to be changed. (DX, Bramblett Dep. at 9-10, 24-26.)

[5/]  Holden was actually assigned the task, but because he had never performed a desk audit before, Bramblett, who was more experienced in this area, assisted. (DX, Bramblett Decl. at ¶ 6; DX, Declaration of Thomas H. Holden, Jr. ("Holden Decl.") at ¶¶ 3-4.)

Admissions ("RFA") No. 18.) The proposed job description then became Pabon-Medina's official job description as a GS-12 electronics technician. (DX, Bramblett Decl., Att. C; DX, Johnson Decl. at ¶ 11.)

Approximately a year earlier, in May or June of 1995, plaintiff requested a desk audit of his position. (DX, Bramblett Decl. at ¶ 2; DX, RFA No. 21.) Either an employee or management can make such a request. (DX, Bramblett Dep. at 10.) Like Pabon-Medina, plaintiff was a GS-11 electronics technician at MSFC. (DX, Bramblett Decl. at ¶ 3.) However, plaintiff's supervisor did not request the desk audit of his position. (*Id.* at ¶ 2; DX, RFA No. 20.) In fact, plaintiff's supervisors certified both before and after his desk audit that his position description accurately reflected his duties. (DX, Dutton Dep., Exs. 1-8.)

Bramblett conducted the desk audit of plaintiff's position. (DX, Bramblett Decl. at ¶ 2.) There is no evidence that anyone other than the plaintiff advised Bramblett that plaintiff was performing GS-12 duties. (*See id.* at ¶ 3.) In fact, prior to plaintiff's desk audit, plaintiff's supervisor, Charles Cooper ("Cooper"), told Bramblett that plaintiff's current position description as a GS-11 Electronics Technician was accurate and reflected the duties plaintiff was currently performing. (DX, Bramblett Decl. at ¶ 3.)

In connection with plaintiff's desk audit, Bramblett spoke to Cooper, plaintiff's supervisor; interviewed plaintiff; observed plaintiff's work; reviewed OPM classification standards; and compared the classification standards with plaintiff's performance. (*Id.* at ¶¶ 3-4, 9.) Bramblett concluded that plaintiff's position did not warrant an upgrade. (*Id.* at ¶ 4, Att. K.) Bramblett wrote a memorandum explaining his decision not to recommend upgrading plaintiff's position. (*Id.* at ¶¶ 4, 9, Att. K.)

4

**B.    Race Discrimination Claim**

The Civil Service Commission (the predecessor to the Office of Personnel Management

("OPM")) found that Crawford, an African-American male, was qualified to work for the federal

government as an engineer in 1976.  (DX, Declaration of Sue Payne ("Payne Decl.") at ¶ 9, Att.

D.)  Prior to coming to work for NASA in October 1987, Crawford worked as an electronics

engineer in the private sector and with the Department of the Army, going from grade level

seven ("GS-07") to GS-12.  (DX, Deposition of James Crawford ("Crawford Dep.") at 8; DX,

Payne Decl. at ¶ 11, Atts. E, F, G.)  When Crawford sought work at MSFC, there were no

openings for engineers, so he applied and was hired as a GS-11 electronics technician.  (DX,

Crawford Dep. at 9-10.)[6/]  On May 21, 1989, Crawford was converted from a GS-11 electronics

technician position to a GS-11 electronics engineer position.  (DX, RFA No. 11.)  Crawford was

subsequently promoted to a GS-12 engineering position on September 23, 1990, and to a grade

level thirteen ("GS-13") engineering position on June 26, 1994.  (DX, RFA No. 12, No.13.)

In order to begin this process, the Propulsion Laboratory, the organization in which

Crawford worked, submitted a SF-52, Request for Personnel Action, seeking to convert

Crawford's position to an engineering position.  (DX, Payne Decl. at ¶ 5, Att. A.)  The SF-52

from the Propulsion Laboratory requesting Crawford's conversion from a technician to an

engineering position originally cited Regulation 335.102 in block 5-D, "Legal Authority."  (*Id.* at

Att. A.)  This entry was corrected by the Standard Form 50 ("SF-50"), Notice of Personnel

Action, dated September 21, 1990, which deleted the reference to Regulation 335.102 and

---

[6/]    Crawford testified that when he interviewed for this position, he discussed the possibility of
being changed over to an engineering position since he had previously worked as an engineer for
the Army and in private industry.  (DX, Crawford Dep. at 11.)

replaced it with "Direct Hire Authority FPM Bulletin 332-86, [dated] 9-30-87." (*Id.* at Att. I.) This correction was also handwritten on the original SF-52 form. (*Id.* at Att. A.) The direct hire authority cited in FPM Bulletin 332-86 expired on October 20, 1988. (*Id.* at ¶ 6, Att. B.) However, direct hire authority for engineers was extended by the OPM in FPM Bulletin 332-90, with an expiration date of October 20, 1989. (*Id.* at ¶¶ 6, 7, Att. C.) Thus, direct hire authority for engineering positions existed at the time of Crawford's conversion.

Plaintiff asserts that he had no knowledge of Crawford's conversion from an electronics technician position to an electronics engineer position until June 1996, when either Ronald Tepool ("Tepool"), one of his former supervisors, or Tony Parton ("Parton"), a union representative, advised him of the conversion. (PX X at 4; DX, Dutton Dep. at 40-41.) Tepool was a supervisor in the division which included, *inter alia*, plaintiff, Crawford, and Jimmy Tunstill ("Tunstill"). (PX F at 9-10, 13, 53-54.) Tepool allegedly complained to Frank Bynum ("Bynum"), then head of Personnel at MSFC, that Crawford was "promoted" to an engineer but plaintiff, Tunstill, and Corky Knowles ("Knowles") were not evaluated for a similar conversion. (*Id.* at 35, 53-54.) Bynum allegedly refused to even consider such actions. (*Id.* at 38-39.)

Tunstill, one of the three white technicians for whom Tepool asserts that he requested a conversion in 1989, had been converted by MSFC personnel to an engineering position in 1988, prior to Crawford's conversion. (*Id.* at 54-55, 57.) Additionally, in June of 1989, which was shortly after Crawford's May 21, 1989 conversion, Sue Payne ("Payne"), a classification Personnel Management specialist in the MSFC personnel office, examined plaintiff's qualifications to see if he met the requisite direct hire qualifications for a general engineering position and found that he did not meet the educational requirements. (DX, Payne Decl. at ¶¶ 1, 14, Att. S.) Plaintiff has provided no evidence that he met the educational requirements.

6

C.    **Administrative EEO Process**

During his employment with NASA, plaintiff first contacted an Equal Employment Opportunity ("EEO") counselor on or about July 31, 1996. (DX, RFA No. 7.) When plaintiff contacted the counselor, he specified the bases of alleged discrimination as sex (male) and race (white). (*Id.* at No. 8.) Plaintiff failed to raise the issue of national origin discrimination before the EEO Counselor. (*Id.* at No. 1.)

Plaintiff filed a formal Complaint of Discrimination with NASA after informal counseling failed to resolve his complaint. (*Id.* at No. 9.) He specified the following bases of alleged discrimination: age (50), race (Caucasian), color (white), sex (male), and retaliation (union membership). (*Id.*) Plaintiff received a letter dated November 18, 1996, from George E. Reese, Acting Associate Administrator for Equal Opportunity Programs, advising him that, *inter alia*, he could file a civil action in U.S. District Court "after 180 days from the filing date of your complaint if an appeal has not been filed and a final decision has not been issued." (*Id.* at No. 22.)

On August 22, 1997, plaintiff requested a hearing by an EEO administrative judge. (PX J at 13.) On May 26, 1998, he withdrew his request for a hearing and requested a Final Agency Decision. (*Id.* at 14, 15.) The EEOC remanded the case back to the Agency for a Final Agency Decision on July 2, 1998. (*Id.* at 16.) The Final Agency Decision was not issued until March 30, 1999. (*Id.* at 41.) Brenda Manuel-Alexander ("Manuel-Alexander"), the Agency Director of the Discrimination Complaints Division, admitted that plaintiff's Final Agency Decision was not issued in a timely manner. (*Id.*) Manuel-Alexander stated that insufficient staffing caused the untimeliness. (*Id.* at 44.)

7

## II.  SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The

movant can meet this burden by presenting evidence showing there is no dispute of material fact,

or by showing the nonmoving party has failed to present evidence in support of some element of

his case on which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *see* Fed.

R. Civ. P. 56(a) and (b).  Once the moving party has met its burden, Rule 56(e) "requires the

nonmoving party to go beyond the pleadings and by . . . affidavits or by the 'depositions,

answers to interrogatories, and admission on file,' designate 'specific facts showing that there is

a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.  Rule 56(c) mandates the entry of summary

judgment against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial. *Celotex*, 477 U.S. at 322.

If the evidence is merely colorable, or is not significantly probative, summary judgment

may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted).

Furthermore, the court must "view the evidence presented through the prism of the substantive

evidentiary burden," so there must be sufficient evidence on which the jury could reasonably

find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d

570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence,

and the drawing of inferences from the facts are the function of the jury, and therefore the

evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his

8

favor. *Anderson*, 477 U.S. at 255.  The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III.  DISCUSSION

**A.**     <u>**National Origin Discrimination**</u>

*1.*     ***Exhaustion of Administrative Remedies***

Count II of plaintiff's Complaint, alleges that plaintiff suffered "wrongful national origin discrimination" as a result of being denied a promotion after the desk audit. (Compl. at ¶ 24.)  It is undisputed that plaintiff did not raise a claim of discrimination based upon national origin during the administrative process. (*See* DX, RFA No. 1, No. 8, No. 9.)  Defendant contends that the court should grant summary judgment based upon plaintiff's failure to raise and exhaust this claim during the administrative process.  (Defendant's Motion for Summary Judgment ("Def.'s Mot.") at ¶ 2; Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.'s Br.") at 12-13.)  Plaintiff contends that the court should hear this claim because: (1) the use of the word "minority" in the EEO Complaint is equivalent to national origin, thus rendering the allegation already raised and investigated, (2) he relied on his EEO counselor when completing his formal complaint form, and (3) a charge of race discrimination pointing to a Hispanic comparator is like or related to a national origin claim such that the Agency should have investigated this claim as a national origin claim. (Pl.'s Br. at 12-13.)  Plaintiff argues that "[u]nder the circumstances of this case the national origin aspect of the preferential treatment afforded Pabon-Medina was sufficiently raised in the administrative proceedings. (*Id.* at 13.)  The court disagrees.

9

Exhaustion of administrative remedies is a prerequisite for federal employees filing discrimination claims. *Brown v. General Services Administration*, 425 U.S. 820, 832 (1976); *Grier v. Secretary of the Army*, 799 F.2d 721, 724 (11th Cir. 1986). Administrative exhaustion "is not a technicality." *Grier,* 799 F.2d at 424. The federal sector provision of Title VII created "a dispute resolution system that requires a complaining party to pursue administrative relief prior to court action, thereby encouraging quicker, less formal, and less expensive resolution of disputes within the Federal Government and outside of court." *West v. Gibson*, 527 U.S. 212, 218-19 (1999).

The federal sector provision of Title VII lists race and national origin, *inter alia*, as distinct bases of discrimination claims. 42 U.S.C. § 2000e-16(a). Race and national origin claims are not identical. *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 546 (6th Cir. 1991) (upholding dismissal of a race claim for failure to exhaust where national origin discrimination was alleged administratively). In the Title VII context, national origin "refers to the country where a person was born, or more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973). The EEOC "recognizes that the EEO classification 'Hispanic' generally references a national origin category." *Moore v. Secretary of Treasury*, Appeal No. 01933704, 1994 WL 746321, * 5 n.2 (E.E.O.C. June 17, 1994); *see also* 29 C.F.R. § 1606.1.[2/] This court is unwilling to equate race and national origin claims and to

---

[2/] 29 C.F.R. § 1606.1 provides, in part:

> The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group. . . .

10

render exhaustion of one claim tantamount to exhaustion of both claims. *See Ang,* 932 F.2d at 540. Thus, plaintiff's first and third arguments, as set out above, are unavailing.

29 C.F.R. § 1614.105(a)(1) provides that an employee such as plaintiff has 45 days to contact an equal opportunity counselor about matters he alleges are discriminatory. Since plaintiff never raised national origin discrimination to the EEO counselor, plaintiff's argument that he relied upon the EEO counselor in drafting his formal complaint form is irrelevant; the undisputed fact is that plaintiff never raised the claim informally to the counselor. Because plaintiff failed to raise national origin discrimination to an EEO counselor, his second argument, as set out above, is unavailing. Thus, defendant is entitled to judgment as a matter of law on plaintiff's national origin discrimination claim because of plaintiff's failure to exhaust administrative remedies.

### 2. Underlying Claim

Even if plaintiff had exhausted his administrative remedies, defendant would be entitled to judgment on plaintiff's Title VII claim related to the promotion of Pabon-Medina. In any action alleging disparate treatment by an employer, the plaintiff must prove that the employer acted with a discriminatory motive. *International Board of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977). To establish a prima facie case of discrimination, a plaintiff may employ direct evidence of discriminatory intent, statistical proof of a pattern of discrimination, or circumstantial evidence. *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989). The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon whether the plaintiff's proof is direct or circumstantial in nature.

11

a.      Direct Evidence

In this case, the record does not contain any direct evidence of discrimination.[8/]  At

plaintiff's deposition, when asked Pabon-Medina's national origin, plaintiff responded "I don't

know."  (DX, Dutton Dep. at 50.)  When asked why he alleged that national origin was a factor

in Pabon-Medina's promotion, plaintiff again replied, "I don't know."  (*Id.* at 51.)  However,

plaintiff now contends that he has direct evidence of national origin discrimination.  (Pl.'s Br. at

14-15.)  This claim could be dismissed without reaching the merits of the allegations as plaintiff

flatly denied that he had such evidence in discovery.[9/]  Nonetheless, an analysis of the proffered

"direct" evidence reveals that it is either irrelevant or inadmissible.

The first purported instance of direct evidence of national origin discrimination to which

plaintiff cites is Cooper's testimony concerning an undisclosed letter or memo from Goldin, in

---

[8/]  "Direct evidence is '[e]vidence which if believed, proves existence of fact in issue *without inference or presumption.*'"  *Rollins v. Techsouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). Although it may seem reasonable to infer that a person who makes a discriminatory remark outside of the decisional process will conduct business in a discriminatory manner, such a conclusion requires an inference.  Therefore, comments made completely outside of the decisional process do not constitute direct evidence that the speaker discriminated in making the employment decision at issue.  *Compare Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 930-31 (11th Cir. 1995) (holding that employer's statement that women were not tough enough to do the job constituted direct evidence of sex discrimination) *with Equal Employment Opportunity Comm'n v. Alton Packaging Corp.*, 901 F.2d 920, 923-24 (11th Cir. 1990) (holding that decision maker's statement to black employee that "you people can't do a --------- thing right" did not constitute direct evidence of discrimination).

[9/]      5.  Admit that you have no direct evidence of discrimination with respect to your
          allegations in your complaint.
               RESPONSE: Admit."
(DX, RFA No. 5.)  Plaintiff has not disputed that he failed to supplement this discovery response.

12

which he stated that there would be "no SES[10] promotions within NASA until parity was reached with minorities." (PX E at 48-50.)[11] Plaintiff claims that he should have been promoted to a GS-12 position, not an SES position. (Pl.'s Br. at 12, 15-16; PX X at 4.) Thus, not only is Goldin's alleged statement regarding SES promotions not direct evidence of discrimination, it is not even relevant evidence because this case does not involve an SES promotion.

The second instance of purported direct evidence of national origin discrimination is inadmissable hearsay which is not reducible to admissible form at trial and therefore cannot be used to defeat summary judgment. *See Pritchard v. Southern Company Services*, 92 F.3d 1130, 1135 (11th Cir. 1996); *see also, Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 962 (11th Cir. 1997).[12] Plaintiff alleges that an unnamed "friend" in the personnel office allegedly told Cooper that Pabon-Medina's position was upgraded based upon an affirmative action policy, not because a job audit justified the promotion. (Pl.'s Br. at 14-15.)[13] When questioned at his deposition on this issue, Cooper stated that he could not remember with whom he spoke in the

_____

[10] "SES" refers to the Senior Executive Service. *See*, 5 U.S.C. § 3132(a)(2) ("'Senior Executive Service position' means any position in an agency which is classified above GS-15 . . . .").

[11] Cooper testified that this information was in a "letter" or an "excerpt from a memo," that "somebody got . . . through the mail . . . , but we lost it." (PX E at 48-49.)

[12] Plaintiff cites *Walker v. Darby*, 911 F.2d 1573 (11th Cir. 1990), for the proposition that such evidence is not hearsay, but a non-hearsay admission. In a footnote in *Walker*, the court noted that statements of two specifically named individual defendants were admissions by party opponents and, therefore, admissible hearsay. 911 F.2d. at 1578 n.6. That is not the case here. Plaintiff points to the hearsay statement of a totally unknown Agency employee. Plaintiff has cited no law supporting the proposition that a statement of an unidentified government employee binds the government as an admission, and the court concludes that the alleged statements to which plaintiff cites are insufficient to bind the government in this case.

[13] Cooper, then a Branch Chief, was plaintiff's first-level supervisor during the time period at issue, but he was not Pabon-Medina's first-level supervisor. (*Id.* at 12-13, 17-18.)

13

personnel office. (PX E at 75-76.)[14]  Cooper could not give any indication of the status of the
alleged source except to state that it was someone in the personnel office.  (*Id.*)  Further, the
alleged source was not identified as a manager or someone with authority to bind defendant.
The alleged statement by an unknown person in personnel to Cooper is 1) inadmissible and 2)
even if admissible, it is not direct evidence of discrimination.

      b.     Circumstantial Evidence

     Although there is no direct evidence to support plaintiff's discrimination claim, plaintiff
may rely on circumstantial evidence to support his claims in which case the court is governed by
the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas
Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v.
Burdine*, 450 U.S. 248 (1981).  *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th
Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence).[15]  Under
this framework, the plaintiff bears the initial burden of establishing a prima facie case of
discrimination. *Burdine*, 450 U.S. at 252-53.  "The facts necessarily will vary in
[discrimination] cases, and the specification . . . of the prima facie proof required from [plaintiff]
is not necessarily applicable in every respect to differing factual situations." *McDonnell
Douglas,* 411 U.S. at 802 n.13.

     If the plaintiff successfully establishes a prima facie case, the burden of production shifts
to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment

---

[14]  Cooper, who was retired at the time of the deposition, stated that he was not uncomfortable
identifying the person; he simply could not recall.  (PX E at 76.)

[15]  *See also, Coutu v. Martin County Board of County Commissioners,* 47 F.3d 1068, 1073-74
(11th Cir. 1995) (applying the *McDonnell Douglas* burden-shifting analysis to plaintiff's claim
of national origin discrimination).

14

action. *McDonnell Douglas*, 411 U.S. at 802. Defendant's burden to rebut the presumption

created in such a situation is one of production rather than proof, requiring defendant to

articulate a legitimate, nondiscriminatory reason for its action. *Burdine*, 450 U.S. at 257-58. In

satisfying this burden:

> [t]he employer's burden of rebuttal is "exceedingly light." Since the rebuttal
> burden is one of production only, the employer "need not persuade the court that
> it was actually motivated by the proffered reasons . . . . It is sufficient if the
> [employer's] evidence raises a genuine issue of fact as to whether it discriminated
> against the [employee]."

*Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1495 (11th Cir. 1989) (quoting

*Burdine,* 450 U.S. at 254-55) (alterations in original).

If the defendant succeeds in carrying this burden, then any "presumption of

discrimination created by the *McDonnell Douglas* framework drops from the case, and the

factual inquiry proceeds to a new level of specificity." *Combs,* 106 F.3d at 1528 (quotation

omitted). The plaintiff must then prove that the defendant's articulated reasons are a mere

pretext for unlawful motives (i.e., discrimination or retaliation). *Id.* A plaintiff's prima facie

case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's

proffered explanation for its actions is enough to preclude entry of judgment as a matter of law.

*Id.* at 1529; *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At all times, the

plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted

with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

To avoid summary judgment, a plaintiff must submit sufficient nonconclusory evidence

that defendant's articulated legitimate reasons for the employment decisions were pretextual.

*Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471-72 (11th Cir. 1991); *Carter v. City of*

*Miami*, 870 F.2d 578, 585 (11th Cir. 1989). Plaintiff must put forth concrete evidence that casts

sufficient doubt on defendant's proffered reasons such that a reasonable fact finder would

conclude that those reasons did not actually motivate the promotion decisions. *See Combs*, 106

F.3d at 1538; *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1083-84 (11th Cir. 1990).

In this lawsuit plaintiff brings reverse discrimination claims. The Eleventh Circuit has

addressed plaintiff's prima facie burden:

> In **reverse discrimination** suits, plaintiffs must establish a
> *McDonnell Douglas* prima facie case. The test requires a **reverse
> discrimination** plaintiff to prove: 1) that he belongs to a class; 2)
> that he applied for and was qualified for a job; 3) that he was
> rejected for the job; and 4) that the job was filled by a minority
> group member or a woman.

*Wilson v. Bailey*, 934 F.2d 301, 304 (11th Cir. 1991).

In this case it is necessary to adapt the *McDonnell Douglas* test further. Thus, with

regard to plaintiff's claim that he was discriminated against on the basis of his national origin

when Padon-Medina was granted preferential treatment in a desk audit, a prima facie case could

be established if plaintiff proves: 1) that he belongs to a class; 2) that he was qualified for a

promotion; 3) that he did not receive the promotion; and 4) that a person of Hispanic background

or nationality received the promotion.

Plaintiff claims that he was discriminated against on the basis of his national origin

(Caucasian) when Pabon-Medina "was granted preferential treatment in a desk audit promotion."

(Motion in Opposition to Summary Judgment at 1; *see also* Pl.'s Br. at 12-16.) Defendant does

not contest plaintiff's prima facie case of national origin discrimination. Assuming that plaintiff

has established a prima facie case, defendant has articulated legitimate nondiscriminatory

reasons for the decision to upgrade Pabon-Medina's position and not plaintiff's position. (Def.'s

Br. at 3, 10-11, 15.) Defendant asserts that "Pabon-Medina's job duties and responsibilities

16

warranted the upgrade and [plaintiff's] did not." (Def.'s Br. at 3.) Further, defendant asserts that

"'Personnel,' the alleged discriminators according to [plaintiff], acted upon the recommendation

of the larger organization over both [plaintiff] and Pabon-Medina, and promoted the employee

they were requested to promote." (Def.'s Reply Memorandum ("Def.'s Reply") at 6.)

　　　　Plaintiff has not put forth sufficient evidence on which a reasonable jury could find

defendant's articulated reason to be pretext for illegal reverse national origin discrimination.

Plaintiff points to numerous facts as purported evidence of pretext: (1) plaintiff was rated as an

excellent employee by his management; (2) plaintiff was performing the work of a GS-12

engineer inasmuch as he generated reports and initiated test design, thereby justifying a position

upgrade from GS-11 to GS-12; (3) Pabon-Medina did not write reports or engage in testing; (4)

the NASA Personnel Office refused to provide plaintiff's management (Cooper) with access to

the criteria for the desk audit process; (5) when Pabon-Medina was suggested for the desk audit,

several supervisors within the organization opposed it; (6) plaintiff's management (Cooper)

opposed the decision of the personnel office denying plaintiff's upgrade to GS-12 and supported

a job description change to upgrade plaintiff's position to a GS-12; (7) plaintiff was recognized

in his Performance Appraisal as doing the work of a "test engineer;" (8) a personnel office

representative admitted to Cooper that Pabon-Medina's desk audit did not justify the upgrade to

GS-12; and (9) personnel office representatives were instructed to inflate Pabon-Medina's desk

audit scores. (Pl.'s Br. at 15-16.)

### (i)　Rated as an Excellent Employee

　　　　Plaintiff first asserts that defendant's articulated reason is pretextual because plaintiff

was rated as an excellent employee by his management. (Pl.'s Br. at 15.) This evidence does

not establish pretext since plaintiff has produced no evidence as to Pabon-Medina's ratings and

17

that the employees in the personnel office charged with conducting the desk audits knew and considered the ratings. Additionally, Cooper, the cited source of the evidence, admitted that he was not involved in Pabon-Medina's ratings/evaluations. (*See* PX E at 63, 64.)

### *(ii)    Writing Test Reports and Conducting Testing*

Plaintiff asserts that because he wrote test reports and conducted testing for NASA, he was performing the work of a GS-12 engineer and, therefore, his position should have been upgraded from GS-11 to GS-12. (Pl.'s Br. at 15.) However, plaintiff has pointed to no evidence supporting such an assertion. It is undisputed that plaintiff wrote test reports and conducted testing. Plaintiff's GS-856-11 Position Description lists first among his "Major Duties:" "Serves as an Electronics Technician assigned to the Experiments and Components Test Branch which is responsible for development and verification testing of experiments and spacecraft components, systems and ground support equipment . . . . " (DX, Dutton Dep., Ex. 1 at 2.) However, evidence that plaintiff performed his duties does not support an inference that defendant's articulated reasons for not upgrading his position are pretext for unlawful reverse discrimination.

### *(iii)    Cooper's Testimony*

Also as evidence of pretext, plaintiff argues that Cooper felt that plaintiff should have qualified for the desk audit upgrade to GS-12; Cooper opposed the decision of the personnel office denying plaintiff's upgrade to GS-12; and Cooper supported a job description change to upgrade plaintiff's position to GS-12. (Pl.'s Br. at 16.) While Cooper may now opine that plaintiff was qualified for an upgrade, the contemporaneous evidence of record from Cooper himself documents otherwise.

Cooper stated in his administrative affidavit that plaintiff "requested a desk audit, I felt, prematurely." (PX B at ¶ 3.) He elaborated that, in his opinion, rather than seeking a desk audit,

18

plaintiff should have gone back to college or sought to be rehired as an engineer through established personnel procedures. (*Id.* at ¶ 2; PX E at 69, 70.) Cooper stated that he "would've approved [a desk audit request] for anybody," (PX E at 24); yet, Cooper did not request a desk audit of plaintiff's position; the request for the audit of plaintiff's position came solely from plaintiff. (DX RFA No. 20, No. 21.) Further, Cooper acknowledged that most desk audits fail. (PX E at 69.) On February 27, 1995, just months before the May/June 1995 desk audit of plaintiff's position, Cooper certified that plaintiff's major duties and responsibilities as described in his GS-11 electronics technician position description were accurate and current and that plaintiff was performing his duties within the scope of his position description. (DX, Dutton Dep. at Ex. 7.)

Additionally, Cooper premised his testimony upon his understanding that plaintiff had a computer science degree. (PX E at 65-66, 72.) Plaintiff, however, had a General Studies Degree. (DX, Payne Decl., Att. R.) Cooper stated that he was aware of a number of people with GS-13 ratings with a computer science degree, and that his opinion could change if plaintiff did not have a computer science degree. (PX E at 66.) Thus, Cooper's opinion that plaintiff should have been upgraded was based at least in part upon an error concerning plaintiff's educational qualifications.

Although Cooper may now believe that plaintiff deserved to be upgraded to GS-12, Cooper certified repeatedly that plaintiff's GS-11 electronics technician position description was fair and accurate. (DX, Dutton Dep., Exs. 1-8.) Bramblett stated that he spoke to Cooper during his desk audit of plaintiff's position and Cooper advised him at the time that plaintiff's job description was accurate. (*Id.*) Thus, there is no evidence on which a reasonable fact-finder could find that Cooper's current belief that plaintiff's position should have been upgraded

19

demonstrates that Bramblett's decision not to upgrade plaintiff's position was based on illegal reverse discrimination.[16]

### (iv)   Pabon-Medina's Duties

Plaintiff argues that defendant's reason for not upgrading plaintiff's position is pretextual because Pabon-Medina did not write reports or engage in testing. (Pl.'s Br. at 16.)  To support this assertion, plaintiff cites Cooper's testimony stating that he was not aware of any reports that Pabon-Medina wrote or any testing that Pabon-Medina performed. (*Id. citing* PX E at 39.) However, Cooper was not Pabon-Medina's supervisor, was not in his chain of command, and had no knowledge of his day-to-day activities. (PX E at 63-64.)  In fact, after being questioned about Pabon-Medina's report writing, Cooper stated that he had "no reason" to know the kind of reports Pabon-Medina may have written. (*Id.* at 39.)  Further, the job description presented by Johnson, Pabon-Medina's first-level supervisor, clearly reflects that Pabon-Medina wrote reports and routinely engaged in testing. (DX, Johnson Decl., Att. A.)  Further, Bramblett and Holden relied upon this job description in evaluating Pabon-Medina's position. (DX, Bramblett Decl. at ¶ 7, Att. F; DX, Holden Decl. at ¶ 5, Att. C.)  Thus, nothing pertaining to Pabon-Medina's job description serves as evidence of pretext.

### (v)   Opposition to Pabon-Medina's Upgrade

Plaintiff further argues that defendant's articulated reason for upgrading Pabon-Median's position and not upgrading the plaintiff's is pretextual because supervisors within the organization opposed Pabon-Medina's desk audit. (Pl.'s Br. at 16.) Defendant does not dispute that when Pabon-Medina was suggested for the desk audit, two supervisors within the

---

[16]   The court notes again the audit of plaintiff's position occurred *a year before* the audit of Pabon-Median's position.

20

organization opposed it. Cooper testified that Jim Lindsay ("Lindsay") and Randy Stevens ("Stevens") were "opposed" to the organization's submission of Pabon-Medina for an upgrade from GS-11 to GS-12. (PX E at 45-46.) Cooper identifies Stevens only as "a branch chief or what we were at the time, . . . he was on the same level with me." (*Id.* at 43-44.) There is no indication that Stevens had personal knowledge of plaintiff's or Pabon-Medina's qualifications. Lindsay opposed the submission of Pabon-Medina for a promotion because he was advocating the promotion of another technician. (DX, Deposition of Jim J. Lindsay ("Lindsay Dep.") at 18-20.) Significantly, there is no evidence that the Systems Analysis and Integration Laboratory let anyone in the MSFC personnel office know of any manager's disagreement. Thus, this evidence does not create an inference of pretext.

### (vi)   Access to Desk Audit Procedures

Plaintiff asserts that the NASA Personnel Office refused to provide his management (Cooper) with access to the criteria for the desk audit process. (Pl.'s Br. at 16.) Although Cooper stated that Bramblett did not provide him with criteria for a GS-12 electronics technician position, (PX E at 40, 42-43), almost immediately thereafter he stated: "I don't think there's any criteria for a 12, other than it goes beyond – you go beyond 11." (PX E at 41.) Bramblett's testimony confirms this. (DX, Bramblett Dep. at 24, 33-34.) Even assuming Cooper was not provided access to the criteria for the desk audit process, this is insufficient evidence, either alone or in combination with plaintiff's other arguments, on which a reasonable jury could find that defendant's articulated reason for not upgrading plaintiff's position was pretext for illegal reverse discrimination based on national origin.

### (vii)  "Test Engineer"

Plaintiff also alleges as evidence of pretext the fact that he was noted in a Performance

21

Appraisal as doing the work of a "test engineer." (Pl.'s Br. at 16.) The evidence to which

plaintiff cites indicates that, for the period from October 1, 1992, to September 30, 1993,

plaintiff "assumed the task of test engineer for the carbon dioxide removal assembly . . . ." (PX

X at 30.) That same reference also states that plaintiff "performed his assigned duties in an

excellent manner . . . ." (*Id.*) There is no question from that document that his assigned duties

were as an Electronics Technician, Series 856, GS-11. (*Id.*) The document is actually only one

page of plaintiff's fiscal year 1993 performance appraisal. (*See* DX, Dutton Dep., Ex. 4.) The

document in its entirety indicates that on October 29, 1993, Cooper certified that the major

duties and responsibilities of plaintiff's position were accurate and current and that he was

performing duties within the scope of this position description. (*Id.*) In light of this

certification, there is no reason to believe that the use of the word "engineer" and the

performance of some engineering duties transformed plaintiff from an electronics technician to

an engineer.

#### *(viii)    Statements concerning Pabon-Medina's Promotion*

Plaintiff also argues two hearsay statements constitute evidence of pretext: (1) that a

representative from the MSFC personnel office admitted to Cooper that Pabon-Medina's desk

audit did not justify the upgrade to GS-12, and (2) that representatives from the MSFC personnel

office were instructed to inflate Pabon-Medina's desk audit scores. (Pl.'s Br. at 16.) The

assertion that a "Personnel Office representative" admitted to Cooper that Pabon Medina's desk

audit did not justify the upgrade is the same inadmissible hearsay discussed above in Section

III(A)(2)(a). The source is totally unidentified, *i.e.,* "probably an acquaintance" of Cooper,

whose identity Cooper, could not recall. (PX E at 75-76.)

22

The second statement is also inadmissible hearsay. Murphy Dale Armstrong

("Armstrong") stated in an affidavit:

> I believe one of the managers told me that the personnel specialist, when he was questioned about the results of the audit of Mr. Pabon-Medina's position, told the manager that he was overruled and directed to give high marks to Mr. Pabon-Medina by someone higher in Personnel.

(PX C at ¶ 3.) Armstrong stated that Cooper informed him of this information during an

informal conversation. (PX I at 19-20.) As noted above, Cooper could not identify the source of

such information. (PX E at 75-76.) Additionally, there is no evidence of record regarding any

"scores" to be inflated. Such unsubstantiated allegations are insufficient to establish pretext.

### (ix) Conclusion

The record indicates that plaintiff was a good employee who had duties which included

some engineering duties. (DX, Dutton Dep., Exs. 1-8.) However, the record also indicates that

Pabon-Medina performed similar duties. Pabon-Medina's supervisor requested that Pabon-

Medina's position be audited. (DX, Johnson Decl., Att. A; DX, RFA No. 19.) Pabon-Medina's

supervisor provided the MSFC personnel office with a draft of a new position description which

he stated more accurately reflected the duties Pabon-Medina was actually performing. (DX,

Johnson Decl. at ¶ 5, Att. A; DX, Bramblett Decl. at ¶ 7, Att. F.) James N. Strickland, the

Director of the Systems Analysis and Integration Laboratory, approved the promotion. (DX,

Johnson Decl. at ¶ 6, Att. B.)

In contrast, plaintiff requested his own desk audit. (DX, RFA No. 21.) Bramblett

conducted plaintiff's desk audit in May/June 1995. (DX, Bramblett Decl. at ¶ 2.) Plaintiff's

then second-level supervisor Lindsay stated that plaintiff's request was "premature." (DX,

Lindsay Dep. at 24-25.) Between May 1992, and February 1996, plaintiff's supervisors certified

23

seven times that his position description accurately described his duties.[17]  Plaintiff testified that he was not alleging that his supervisors or managers were discriminating against him; instead, his complaints of discrimination are directed against personnel office employees. (DX, Dutton Dep. at 11, 22.) Plaintiff's first-level supervisor, Cooper, told Bramblett that plaintiff's GS-11 description was accurate and did not request that it be changed. (DX, Bramblett Decl. at ¶ 3.) Bramblett's independent assessment of the position, based upon the applicable classification standards, confirmed that plaintiff's position did not warrant an upgrade. (*Id.* at ¶ 4, Att. K.)

There is no evidence that anyone advised Holden and Bramblett that Pabon-Medina should not be promoted or advised Bramblett that plaintiff should be promoted. After conducting the desk audits, Holden and Bramblett acted in accordance with the Laboratory's request.

There is no evidence establishing that Holden and Bramblett favored Pabon-Medina on the basis of his national origin. In other words, there is no evidence that Holden and Bramblett engaged in reverse discrimination when they promoted Pabon-Medina to a GS-12 position after a desk audit when, a year earlier, they denied plaintiff a promotion after a desk audit. The court will not second-guess an employer's legitimate assessment of whether an employee is qualified

---

[17]  On May 21, 1992, October 30, 1992, October 29, 1993, and February 27, 1995, Cooper (plaintiff's then first-level supervisor) certified that the major duties and responsibilities of plaintiff's position were accurate and current and that plaintiff was performing these duties within the scope of the position description. (DX, Dutton Dep. at 23-24, 26-29, Exs. 3-4, Exs. 6-7.) On September 10, 1993, Cooper certified that plaintiff's position description accurately stated the major duties and responsibilities of his position and its organizational relationships. (*Id.* at 26, 27, Ex. 5.) J.R. Mitchell ("Mitchell") made a similar certification in August of 1995. (*Id.* at 29-30, Ex. 8.) On February 29, 1996, Lindsay (plaintiff's then first-level supervisor) certified that the major duties and responsibilities of plaintiff's position were accurate and current and that plaintiff was performing these duties within the scope of the position description. (*Id.* at 19-20, Ex. 2.)

for a particular position. *Mitchell v. USBI* Co., 186 F.3d 1352, 1354 (11th Cir. 1999). Plaintiff has failed to put forth sufficient evidence on which a reasonable jury could find that defendant's articulated reason for not upgrading plaintiff's position and for upgrading the position of Pabon-Medina was pretext for unlawful reverse discrimination based on national origin. Thus, even if plaintiff had exhausted his administrative remedies and was entitled to bring a claim, defendant is entitled to judgment as a matter of law on this alternate basis.

## B. RACE DISCRIMINATION

### 1.    Timeliness of Administrative Complaint

Count III of plaintiff's Complaint alleges that plaintiff suffered "wrongful race discrimination" when he was denied a promotion similar to that of Crawford. (Compl. at ¶ 27.) Crawford, the minority employee plaintiff identified as being better treated, was converted from a GS-11 electronics technician's position to a GS-11 electronics engineer's position on May 21, 1989. (DX, RFA No. 11.) Over seven years later, on July 31, 1996, plaintiff contacted an EEO Counselor alleging discrimination on the basis of race. (*Id.* at No. 7.)

As previously noted, the EEOC regulations state: "[a]n aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105 (a)(1). Plaintiff contends that his contact with the EEO counselor was "timely" because it was within 45 days of being told by his former supervisor Tepool that Crawford had been "promoted" to a GS-12 engineer and that three white employees (including plaintiff) were not similarly treated. (*See* Pl.'s Br. at 6-7.) However, because the action plaintiff alleges to be discriminatory occurred *seven years and two months* prior to plaintiff's contacting an EEO counselor, plaintiff's race discrimination claim is untimely.

25

A federal employee's unexcused failure to timely initiate an administrative

discrimination complaint results in dismissal of the suit. *Manning v. Carlin*, 786 F.2d 1108,

1109 (11th Cir. 1986); *Oaxaca v. Roscoe*, 641 F.2d 386, 391-92 (5th Cir. Unit A April 3, 1981);

*Bickham v. Miller*, 584 F.2d 736, 737-38 (5th Cir. 1978).[18/] Compliance with the time limits in

Title VII cases is not jurisdictional. *Bates v. Tennessee Valley Authority*, 851 F.2d 1366, 1368

(11th Cir. 1988). Rather, the administrative time limits are similar to a statute of limitations, and

are subject to waiver, estoppel, and equitable tolling. *Id.*

## 2.    Equitable Tolling

Equitable tolling, if applicable, could allow the untimely suit to proceed, even against the

federal defendant. *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95-96 (1990).

However, "[t]he doctrine of equitable tolling has its limits . . . . It does not permit plaintiffs to

suspend the time for filing discrimination complaints indefinitely when they discover instances

of disparate treatment of other employees months or years after their discharge," *Pacheco v.*

*Rice*, 966 F.2d 904, 907 (5th Cir. 1992), and plaintiff has asserted no basis for equitable tolling.

According to the Supreme Court in *Irwin*:

> Federal courts have typically extended equitable relief only sparingly. We have
> allowed equitable tolling in situations where the claimant has actively pursued his
> judicial remedies by filing a defective pleading during the statutory period, or
> where the complainant has been induced or tricked by his adversary's misconduct
> into allowing the filing deadline to pass. We have generally been much less
> forgiving in receiving late filings where the claimant failed to exercise due
> diligence in preserving his legal rights. Because the time limits imposed by
> Congress in a suit against the Government involve a waiver of sovereign
> immunity, it is evident that no more favorable tolling doctrine may be employed
> against the Government than is employed in suits between private litigants.

---

[18/] The United States Court of Appeals for the Eleventh Circuit has adopted as binding precedent
all decisions of the United States Court of Appeals for the Fifth Circuit made prior to October 1,
1981. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981).

> . . . [T]he principles of equitable tolling described above do not extend to what is
> at best a garden variety claim of excusable neglect.

*Irwin*, 498 U.S. at 96-97 (internal citations omitted).  A review of the pertinent cases establishes

that the principles of equitable tolling as acknowledged by the Supreme Court and the Eleventh

Circuit are strictly construed and rarely applied.  *See, e.g., Irwin*, 498 U.S. at 95; *Justice v.*

*United States*, 6 F.3d 1474, 1478-79 (11th Cir. 1993); *Bryant v. United States Dept. of*

*Agriculture*, 967 F.2d 501 (11th Cir. 1992).

      The doctrine of equitable tolling has been applied in certain cases where the employee

had no reason to believe that he was a victim of unlawful discrimination, such as where the

employer affirmatively conceals the discriminatory nature of its conduct or misleads the

employee regarding the nature of his legal rights.  *See Ross v. Buckeye Cellulose Corp.,* 980 F.2d

648, 660-62 (11th Cir. 1993).  The doctrine has also been applied where the EEOC provides

misleading information to the employee that prevents him or her from meeting the applicable

filing requirements.  *See, e.g., Lawrence v. Cooper Communications, Inc.,* 132 F.3d 447, 450-51

(8th Cir. 1998).  It has also been applied to the time taken by a trial court to decide a motion for

appointment of counsel filed within the statutory time limit.  *Wrenn v. American Cast Iron Pipe*

*Co.,* 575 F.2d 544, 546-47 (5th Cir. 1978).  However, equitable tolling is not available where the

employee is aware of the discriminatory nature of the alleged conduct and is knowledgeable

about his or her legal rights.  *See Turlington v. Atlanta Gas Light Co.,* 135 F.3d 1428, 1435 (11th

Cir. 1998); *Ross,* 980 F.2d at 660-61; *McClinton v. Alabama By-Products Corp.,* 743 F.2d 1483,

1486-87 (11th Cir. 1984).  Further, equitable tolling is not available when the plaintiff fails to

exercise due diligence.  *Howell v. Department of the Army,* 975 F.Supp. 1293, 1301 (M.D. Ala.

1997) (citations omitted).

The undisputed facts indicate that Crawford was converted from a GS-11 electronics technician to a GS-11 electronics engineer on May 21, 1989, seven years before plaintiff contacted the counselor. (DX, RFA No. 11.) While Crawford's pay increased at the time of his conversion, his grade did not increase to a grade 12 until September 23, 1990, almost six years before plaintiff contacted the EEO counselor. (*Id.* at No. 12; DX, Payne Decl., Atts. J and K.) To allow this claim to proceed, the court would have to believe that plaintiff was not perceptive enough to note that his co-worker, Crawford, was an engineer rather than a technician for over seven years.

Defendant has produced two documents from plaintiff's own personnel file indicating that he was found not qualified for a conversion comparable to Crawford's. (DX, Payne Decl. at ¶ 14.) One such document is dated December 8, 1987, two months after Crawford was hired by NASA as an electronics technician. (*Id.* at ¶ 14, Att. P.) The other document is dated June 5, 1989, less than a month after Crawford was converted to an electronics engineer. (*Id.* at ¶ 14, Att. S.)[19] The court is of the opinion that plaintiff has failed to exercise due diligence and cannot equitably be excused for his failure to timely seek EEO counseling.

## 3. Underlying Claim

Even if plaintiff had timely filed his administrative Complaint, his claim of race

---

[19] To allow plaintiff to pursue this claim first raised to an EEO counselor over seven years after the alleged discriminatory event, after critical documents have been destroyed and witnesses have retired, prejudices the defendant. The most significant example of prejudice is the defendant's inability to respond to plaintiff's assertion that there is no evidence that the personnel specialist, Shirley Hovis ("Hovis"), (or anyone else) completed and sent the requisite forms for a direct hire to the OPM. (Pl.'s Br. at 10.) The undisputed evidence is that those files, if they existed, were destroyed in accordance with mandatory retention regulations. (DX, Payne Decl. at ¶ 8.) Thus, if plaintiff were allowed to proceed, critical evidence is now unavailable to defendant.

discrimination would still fail. In analyzing plaintiff's claim, the court is governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs,* 106 F.3d at 1527-28 (clarifying the standard to be applied under Eleventh Circuit jurisprudence).[20]

Plaintiff claims that he was discriminated against on the basis of his race when Crawford, an African American, was given preferential treatment and promoted to engineer. (Pl.'s Br. at 6-11.)[21] To establish a prima facie case of reverse race discrimination, plaintiff must prove that: (1) he is a member of a protected class; (2) he was qualified for and applied for the promotion; (3) he was rejected in spite of his qualifications; and (4) the individual who received the promotion was a minority (here African American).

Defendant has not contested plaintiff's prima facie case of reverse race discrimination. Assuming plaintiff has established a prima facie case, defendant has articulated legitimate nondiscriminatory reasons for the decision to promote Crawford, and not plaintiff, to the position of engineer: (1) the Propulsion Laboratory formally requested that Crawford be converted to an engineering position; (2) OPM determined that Crawford was qualified and experienced as an engineer; and (3) plaintiff's experience was not comparable to Crawford's. (Def.'s Br. at 4, 17-20.)

---

[20] This framework is set out in Part III(A)(2)(b) of this Opinion.

[21] As previously noted, Crawford was converted from a GS-11 electronics technician position to a GS-11 electronics engineer position on May 21, 1989. (DX, RFA No. 11.) He was then promoted to a GS-12 engineering position on September 23, 1990. (DX, RFA No. 12.)

29

Plaintiff has not put forth sufficient evidence on which a reasonable jury could find defendant's articulated reasons to be pretext for illegal reverse race discrimination. Plaintiff points to numerous facts as purported evidence of pretext: (1) Crawford's operational management[22] was unaware of the preferential appointment until after it was effectuated by MSFC personnel; (2) Crawford's operational management did not request the special promotion, but opposed it; (3) Crawford's case is the only one within the Division which has taken place without submission by operational management; (4) neither Crawford's immediate supervisor or his Division Chief thought that a special promotion for Crawford was justified; (5) when Tepool, the Division Chief, submitted the names of three similarly situated white male employees for the same preferential treatment, his request was denied; (6) Crawford was the only "General Engineer" within the division; and (7) Crawford's promotion was not a legitimate promotion according to regulations and OPM procedures. (Pl.'s Br. at 8-11.)

### a. Paperwork

Plaintiff alleges that defendant's articulated reasons are pretextual because Tepool was unaware of the appointment until after it was effectuated by the MSFC personnel office. (Pl.'s Br. at 8.) Plaintiff points out that Tepool did not personally submit the necessary paperwork for Crawford's conversion. (Pl.'s Br. at 8.) However, he points to no requirement that Tepool personally sign the form. J.P. McCarty ("McCarty"), Director, Propulsion Laboratory,[23] and J. Wayne Little ("Little"), Director, Science and Engineering, signed the form. (DX, Payne Decl., Att. A.) Tepool testified that he appears to have initialed the request form, although he later

---

[22] Plaintiff uses the phrase "Crawford's operational management" to refer to Tepool. (Pl.'s Br. at 8-9, *citing* PX F (Deposition of Ronald E. Tepool).)

[23] McCarty was Tepool's supervisor. (PX F at 29.)

30

expressed some question about whether he had done so. (PX F. at 25, 61-62.) This evidence does not create an inference that defendant's articulated reason for not promoting plaintiff to the position awarded Crawford was pretext for unlawful reverse race discrimination.

      b.    Opposition to the Promotion

Plaintiff states that there was opposition within the Propulsion Division to the decision to convert Crawford's position. (Pl.'s Br. at 8-9.) However, again, there is no evidence that anyone in the Propulsion Laboratory expressed any opposition to an employee in the MSFC personnel office involved in this personnel action prior to the conversion. Thus, there is no evidence that the alleged discriminators, "Personnel," had knowledge of any facts other than those revealed on the SF-52, Request for Personnel Action, seeking Crawford's conversion.

Tepool was a supervisor in the division which included, *inter alia*, plaintiff, Crawford, and Tunstill. (PX F at 9-10, 13, 53-54.) Tepool allegedly complained that Crawford was promoted to an engineer whereas "three other degreed people in [his] division" – plaintiff, Tunstill, and Knowles – were not evaluated for a similar conversion. (*Id.* at 34-35; PX A at ¶ 6.) Tepool stated in his administrative affidavit that there were three other white technicians in the Division who all had Instrumentation degrees from Athens State, and that he requested that the Personnel Office consider these three technicians for conversions "based on the work they were doing, and the degrees and class work they had completed." (PX A at ¶¶ 6-7.) Tepool stated: "I got a blanket refusal from Personnel." (*Id.* at ¶ 7.)

In his deposition, Tepool acknowledged that when he made the verbal request for the conversion of the three technicians in 1989, he assumed that all three, including plaintiff, had degrees in Instrumentation, and that he "thought Plaintiff had told [him] that he had an instrumentation degree from Athens State." (PX F at 58.) As noted previously, plaintiff's

31

degree is in General Studies. (DX, Payne Decl., Att. R.)  Additionally, assuming it is true that Tepool got a "blanket refusal" from Bynum insofar as examining the qualifications of the white technicians,  Tepool acknowledged in his deposition, that one of the three white technicians he allegedly requested a conversion for in 1989 (Tunstill) had already been converted by the Personnel Office to an engineering position in 1988.  *(Id.* at 54-56.)  Furthermore, it is undisputed that in June 1989, Payne, an employee in the personnel office, examined plaintiff's qualifications to see if he met the requisite direct hire qualifications for a general engineering position, and found that he did not meet the educational requirements.  (DX, Payne Decl. at ¶ 14, Att. S.)  Thus, this evidence is insufficient to create an inference of pretext.

> ## c.     Legitimate Promotion

Plaintiff attacks the actual completion of the form, the SF-52, Request for Personnel Action seeking to have Crawford converted, on multiple bases.  Plaintiff asserts that: (1) the proposed personnel action originally referenced "Regulation 335.102" but did not comply with those regulations; (2) there is nothing on the personnel action form to indicate that it was a direct hire request; (3) Crawford was already an existing employee of NASA and was not eligible for a direct hire; (4) the requested action does not qualify as a reassignment; (5) the legal authority for direct hires under FPM Bulletin 332-86 expired on October 20, 1988, several months prior to this requested action; (6) Hovis[24/] had never been nominated and was not qualified to perform the analysis required under FPM Bulletin 332-86; (7) Hovis's attestation on the form was not accurate; (8) Hovis did not complete the forms required under the FPM bulletin; and (9) Hovis did not review Crawford's personnel file to determine if he met all of the qualifications for the

---

[24/]   Hovis was an employee in the personnel office responsible for effectuating the conversion. (PX D at 7.)

special promotion. (Pl.'s Br. at 9-10.)

### (i) Compliance with Regulations and Procedures

Defendant admitted that there was an error in the originally cited legal authority on the form. (Def.'s Reply at 16-17.) The Request for Personnel Action, SF-52, from the Propulsion Laboratory requesting Crawford's conversion from a technician to an engineering position originally cited Regulation 335.102 in block 5-D, "Legal Authority." (DX, Payne Decl., Att. A.) This entry was corrected by the SF-50 dated September 21, 1990, which deleted the reference to Regulation 335.102 and replaced it with "Direct Hire Authority FPM Bulletin 332-86, [dated] 9-30-87." (*Id.* at Att. I.) This correction was also handwritten on the original SF-52. (*Id.* at ¶ 5, Atts. A and I.)

The direct hire authority in FPM Bulletin 332-86 was extended by the OPM in FPM Bulletin 332-90, with an expiration date of October 20, 1989. (DX, Payne Decl. at ¶ 6, Att. C.) FPM Bulletin 332-90 was in effect at the time of Crawford's conversion on May 21, 1989. (*Id.*) Thus, direct hire authority for engineering positions existed at the time of Crawford's conversion. The Agency's error in not identifying the most current citation for this authority, which was consistently extended throughout the applicable time period, does not demonstrate pretext as to the reasons given by defendant for Crawford's promotion and for the decision not to promote plaintiff.

### (ii) Direct Hire

Plaintiff also asserts as evidence of pretext that there is nothing on the personnel action form to indicate the action was a direct hire; Crawford was an existing employee as of April 27, 1989, the date the form was submitted, and he was not eligible for a direct hire; and the action

33

did not qualify as a reassignment.[25/] (Pl.'s Br. at 9.)  As noted above, the form requesting the

conversion was corrected to indicate the action was a direct hire.  (DX, Payne Decl. at Att. I.)  It

is undisputed that Crawford was a current NASA employee at the time of his conversion.

Plaintiff has proffered no evidence or authority indicating that an existing employee was

ineligible for a job action under the direct hire authority.  The undisputed evidence indicates that

direct hire authority applied to both new hires outside the government, as well as to conversions

to new appointments for current government employees.  (PX H at 8; DX, Payne Decl. at ¶ 7.)

Additionally, the court notes that Payne twice completed a "**Direct Hire** Qualification

Worksheet" assessing whether plaintiff was qualified to be hired as an engineer.  (Payne Decl. at

¶ 14, Atts. P and S.) (Emphasis added.)  Plaintiff was not so qualified.  (*Id.*)  Plaintiff's

assertions fail to create an inference of pretext.

### (iii)    FPM Bulletin

Plaintiff also attempts to establish pretext because there is no evidence that the reporting

requirements of FPM Bulletin 332-90 were met, i.e., requiring agencies to report direct hires to

the OPM, and Hovis was not qualified to perform the analysis required under the FPM Bulletin.

(Pl.'s Br. at 9-10.)  Hovis testified that she did not know if anyone at the MSFC personnel office

completed all the documents that were required to be submitted to OPM for the direct hire.  (PX

D at 63.)  Hovis also testified that she was not responsible for submitting reports to OPM.  (*Id.*)

Defendant asserts that after searching the Agency's files, it appears that the files associated with

direct hires during the applicable time period were purged in accordance with applicable policies

and regulations.  (DX, Payne Decl. ¶ 8.)  Plaintiff has produced no evidence or authority

---

[25/]    Defendant contends this personnel action was a direct hire.  Thus, plaintiff's argument
regarding a reassignment is irrelevant.

indicating that such purging was contrary to applicable policies and regulations. Plaintiff cannot prove that the reporting requirement of FPM Bulletin 332-90 were not met.

### (iv)   Qualifications

As evidence of pretext, plaintiff also asserts that Hovis did not review Crawford's personnel file to determine if he met all of the qualifications for the special promotion. (Pl.'s Br. at 10.) First, plaintiff has pointed to no requirement for file review in determining qualifications. Second, a federal agency seeking to hire Crawford for an electronic engineering position was not required to make an independent assessment of his basic qualifications because the Civil Service Commission had already made this determination on September 20, 1976. (DX, Payne Decl. at ¶¶ 9, 10, Att. D.)[26]

Furthermore, according to Payne, Crawford met the qualifications for a general engineering position, as set forth in the OPM Handbook X-118 ("the handbook"). (Id. at ¶ 9, Att. Q.) Payne testified that Crawford's 1971 degree in Electronics Technology from Alabama A&M University was equivalent to a degree in Engineering Technology, as described in section

---

[26]   The evidence reveals that Crawford began working for the federal government as an engineer in 1976. (DX, Payne Decl., Att. G at 2.) The Civil Service Commission (the predecessor to the OPM) found that Crawford was qualified to work as an electronics engineer (as opposed to an electronics technician) and the Army hired him as such. (Id. at ¶¶ 9, 11, Atts. D, E, and F.) He worked as an electronics engineer for the Army from October 1976, to February 1984, beginning as a grade GS-07 and ending as GS-12. (Id. at ¶¶ 9, 11, Atts. D, E, F, and G.) When he applied for a position at MSFC in 1987, his application stated that he was applying for a position as an "Electric Engineer, GS-855." (Id. at Att. G.) At that time, there were no engineering positions open. (DX, Crawford Dep. at 10.) However, there were electronics technician positions available. (Id.) MSFC hired Crawford as an electronics technician, GS-11. (PX G at 60.) In 1989, the Propulsion Laboratory, the organization in which Crawford worked, formally requested in a SF-52, Request for Personnel Action, that Crawford be changed from an electronics technician to an electronics engineer. (DX, Payne Decl. at ¶ 12, Att. A.)

B(4) of the handbook. (PX H at 19-24.)[27/] Payne testified that prior to joining NASA in 1980, she worked with the local office of OPM from 1963 until 1980. (*Id.* at 24.) Since starting work at NASA in 1980, she worked with colleges and universities, doing "thousands of qualifications determinations for engineers." (*Id.*) She also testified that she was "very, very familiar with the program at Alabama A&M" because she had worked closely with the University over the years to assist them in getting their program upgraded to a professional engineering program. (*Id.*) Payne also testified that NASA was not required to re-determine Crawford's qualifications for a general engineering position, since OPM, the Agency which sets the qualification standards for all federal agencies, had previously certified him as being qualified in 1976. (PX H at 27, 57.)

On the other hand, plaintiff was not qualified to be converted. (PX G at 72-73, 79, 87; DX, Payne Decl. at ¶ 14, Att. S.) The facts reveal that plaintiff's experience was in no way comparable to Crawford's. His work experience was solely as an engineering technician. (DX, Dutton Dep. at 12.) He applied for an electronics technician's job at MSFC and was hired in such capacity. (*Id.*) Plaintiff has presented no evidence that he ever worked in an engineering position in the federal government or in the private sector. The undisputed evidence indicates that he was not converted to an engineering position because he was not qualified for such a position. The OPM has qualification standards for professional engineering positions that federal agencies apply. (DX, Payne Decl. at ¶ 14, Att. Q at 59-64; PX G at 73-84.) The basic requirements include either a degree in professional engineering or a combination of education and experience. (DX, Payne Decl., Att. Q at 59-61.) Each of these two alternatives set out

---

[27/] Plaintiff contends that Payne's determination is not credible because she could not produce a copy of the curriculum for an electronics engineering degree at Alabama A&M in 1971. (Pl.'s Br. at 11.) Given the fact that Payne is testifying about events that occurred in 1989, plaintiff's argument is specious.

specific methods for qualification. (*Id.*) There is no evidence that plaintiff qualified via either of these alternative methods. Further, at oral argument plaintiff's counsel conceded that plaintiff was not qualified under these standards.

The undisputed evidence reveals that Payne, a personnel specialist, was asked to determine whether plaintiff qualified for direct hire as an engineer on two occasions. (*Id.* at ¶ 14, Att. P and S.) She completed a "Direct Hire Qualifications Worksheet" on each occasion. The first was dated December 8, 1987, two months after Crawford was hired, and the second was dated June 5, 1989, less than one month after Crawford's position was converted. (*Id.*) On each occasion, Payne concluded that plaintiff was not eligible to be an engineer. (*Id.*) Plaintiff has not offered any evidence establishing that he meets any of the qualification standards and should have been found eligible. Plaintiff has failed to produce evidence on which a reasonable juror could conclude that defendant's articulated reasons regarding the qualifications for promotion of Crawford were pretext for unlawful reverse race discrimination.

### d.    Conclusion

There is no evidence that the reasons given for the failure to convert plaintiff's position to an electronics engineering position are unworthy of credence or that defendant was motivated by race in the decisions with regard to Crawford and plaintiff. In fact, there is no evidence that plaintiff was or is educationally qualified for an electronics engineer position. Thus, even if plaintiff had timely filed his administrative Complaint, defendant would still be entitled to judgment as a matter of law.

## C.  RETALIATION

In Count IV of his Complaint, plaintiff alleges that "NASA's delay in issuing a Final Agency decision in this case was the result of wrongful reprisal for Plaintiff's filing of

discrimination charges." (Compl. at ¶ 30.) Plaintiff's claim is not that the Agency took an adverse action in retaliation for his having filed an EEO Complaint; rather, it is that the Agency did not act in a timely manner in processing his administrative Complaint of discrimination. Plaintiff has pointed to no waiver of sovereign immunity allowing him to pursue such a claim against his federal employer. (*Id.* at ¶¶ 2, 3.)[28] Thus, this claim must be dismissed for lack of subject matter jurisdiction.[29]

Alternatively, plaintiff's claim is due to be dismissed for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). Under Title VII, employees are protected from retaliation for opposition to unlawful employment practices or for making a charge, testifying, or participating in any investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000-3(a). In analyzing plaintiff's claim, the court is governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence).[30]

---

[28] Plaintiff asserts jurisdiction under 28 U.S.C. § 1331 along with Title VII, 42 U.S.C. § 2000, *et. seq.,* and the Age Discrimination in Employment Act, 29 U.S.C. § 633a. (Compl. at ¶¶ 2, 3.)

[29] Plaintiff bears the burden of pleading and proving subject matter jurisdiction of the court. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182, 189 (1936); *Reynolds v. Army and Air Force Exchange Service*, 846 F.2d 746, 747 (Fed. Cir. 1988). Plaintiff must show that the relief he requests is within a statutory waiver of sovereign immunity. The "United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941); *see also United States v. Mitchell*, 445 U.S. 535, 538 (1980) (*quoting Sherwood*).

[30] This framework is set out in Part III(A)(2)(b) of this Opinion.

Plaintiff alleges that "[t]he total failure of the Agency to comply with clear regulatory provisions exists as an invidious form of retaliation against Agency employee's [sic] prohibited under 29 C.F.R. 1614.101(b)." (Pl.'s Br. at 17.) In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in statutorily protected activity, (2) plaintiff was subjected to an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *Coutu*, 47 F.3d at 1074. Given these requirements, plaintiff fails to state a claim of retaliation as there was no adverse employment action.

Even if the court were to find that plaintiff established a prima facie case of retaliation, he still fails to state a viable claim for relief. The court obviously is not pleased to learn that plaintiff had to wait some nine months before receiving a Final Agency Decision. However, plaintiff did not have to wait for a final Agency decision to come to court. He has admitted that on August 19, 1996, he received a Memorandum from his EEO Counselor, advising him of "[t]he right to file a notice of intent to sue when age is alleged as a basis for discrimination and of the right to file a lawsuit under the ADEA instead of an administrative complaint of age discrimination, pursuant to Section 1614.201(a)." Doc. #23 – RFA Nos. 23 & 24. Thus, on an age discrimination claim, plaintiff could have filed a notice of intent to sue and after the statutory time period, proceeded directly to court without having to wait for a Final Agency Decision. *See Edwards v. Shalala*, 64 F.3d 601, 604 (11th Cir. 1995)(discussing 29 U.S.C. § 633a(d))). With regard to his Title VII claims, plaintiff had to at least initiate the EEO process and wait at least 120 days after the filing of his formal Complaint. However, at that point, he could have filed a civil action without awaiting a Final Agency Decision. *See* 42 U.S.C. § 2000e-16(c).

39

Thus, Congress provided an alternative to Federal sector EEO complainants waiting more than six months for a Final Agency Decision.  That plaintiff chose not to avail himself of this option, which he was admittedly advised of, does not entitle him to seek remuneration given no waiver of sovereign immunity to do so.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that Defendant's Motion for Summary Judgment is due to be granted as to plaintiff's national origin discrimination and racial discrimination claims, and plaintiff's retaliation claim is due to be dismissed.  An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 29th day of September, 2000.

**SHARON LOVELACE BLACKBURN**
United States District Judge